**Sanford ZWICKLER, Plaintiff,**

v.

**Aaron E. KOOTA, as District Attorney of the County of Kings, Defendant.**

No. 66-C-375.

United States District Court
E. D. New York.

May 6, 1968.

———◆———

Emanuel Redfield, New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, for defendant; Samuel A. Hirshowitz, First Asst. Atty. Gen., Brenda Soloff, Asst. Atty. Gen., of counsel.

Before KAUFMAN, Circuit Judge, ZAVATT, Chief District Judge, and ROSLING, District Judge.

ROSLING, District Judge.

The mandate of the Supreme Court upon reversal in the context of its opinion [1] requires this three-judge court to determine whether the facts alleged in the plaintiff Zwickler's complaint disclose a controversy with the defendant District Attorney of sufficient substance to warrant the award of a declaratory judgment. Should we so hold we are called upon then to adjudicate whether the New York statute which plaintiff impugns is so "repugnant to the guarantees of free expression secured by the Federal Constitution" that it should be voided, with or without a grant of injunctive relief against its enforcement for future violation through criminal prosecutions hereafter brought.

The subject statute is § 781–b of the Penal Law of New York State, McKinney's Consol.Laws, c. 40, as in force on April 22, 1966, the date of the inception of the action.[2] In broad outline,

---

1. 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), reversing 261 F.Supp. 985 (E.D.N.Y.1966).

2. Penal Law § 781-b (now superseded in identical language by Election Law § 457, added L.1965, c. 1031, § 43, eff. Sept. 1, 1967,) reads:

 "No person shall print, publish, reproduce or distribute in quantity, nor order to be printed, published, reproduced or distributed by any method any handbill, pamphlet, circular, post card, placard or letter for another, which contains any statement, notice, information, allegation or other material concerning any political party, candidate, committee, person, proposition or amendment to the state constitution, whether in favor of or against a political party, candidate, committee, person, proposition or amendment to the state constitution, in connection with any election of public officers, party officials, candidates for nomination for public office, party position, proposition or amendment to the state constitution without also printing or reproducing thereon legibly and in the English language the name and post-office address of the printer thereof and of the per-

as pertinent to plaintiff's situation, the provision, now superseded without change by Election Law, McKinney's Consol.Laws, c. 17, § 457, made it a crime to distribute for another, among other things, *any* handbill in quantity which contained *any* statement concerning *any* candidate in connection with *any* election of public officers, unless there were printed thereon the name and post office address of the printer thereof and of the person at whose instance such handbill was so distributed. The penalties established for infraction were severe. A first offense was declared a misdemeanor; succeeding violations constituted felonies.[3]

Zwickler was convicted of violating § 781–b by his distribution of anonymous handbills no more than mildly critical of a speech delivered on the floor of the House of Representatives by a United States Congressman who was at the time (1964) standing for re-election. The conviction was reversed by the New York Supreme Court, Appellate Term, on state law grounds. The memorandum on reversal stated that the constitutional question had not been reached.[4] The New York Court of Appeals affirmed without opinion, People v. Zwickler, 16 N.Y.2d 1069, 266 N.Y.S. 2d 140, 213 N.E.2d 467.

Zwickler next invoked the Federal District Court's jurisdiction under the Civil Rights Act, 28 U.S.C. § 1343, and the Declaratory Judgment Act, 28 U.S.C. § 2201, by bringing this action against the District Attorney of Kings County in which he sought a declaration that § 781–b was unconstitutional and an injunction against its enforcement.

■ We must first decide whether the facts, set out in some detail below, present a controversy of sufficient immediacy to support action for declaratory judgment. We hold that they do and, hence, such declaration should be made.

The statute reviewed is not one which has lapsed into "innocuous desuetude" through a legislature's prolonged disregard and "prosecutorial paralysis" so that the issue of its constitutionality is not here justiciable. We are not in *Zwickler* confronted as was the court in Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), cited by defendant, with eighty years of inactivity on the part of state authorities in implementing the penal statute[5]

---

son or committee at whose instance or request such handbill, pamphlet, circular, post card, placard or letter is so printed, published, reproduced or distributed, and of the person who ordered such printing, publishing, reproduction or distribution, and no person nor committee shall so print, publish, reproduce or distribute or order to be printed, published, reproduced or distributed any such handbill, pamphlet, circular, post card, placard or letter without also printing, publishing, or reproducing his or its name and post-office address thereon. A violation of the provisions of this section shall constitute a misdemeanor.

"The term 'printer' as used in this section means the principal who or which by independent contractual relationship is responsible directly to the person or committee at whose instance or request a handbill, pamphlet, circular, post card, placard or letter is printed, published, reproduced or distributed by such principal, and does not

include a person working for or employed by such a principal."

3. Penal Law § 782 (repealed and simultaneously re-enacted as Election Law § 458, similarly effective on September 1, 1967).

4. "In our opinion, the People failed to establish that defendant distributed anonymous literature 'in quantity' in violation of the provisions of Section 781(b) [sic] of the Penal Law. We do not reach the question of the constitutionality of the statute involved." People v. Zwickler, Sup.Ct.App.Term, Kings Co., April 23, 1965 (unreported), as quoted in Zwickler v. Koota, 261 F.Supp. at 987.

5. The laws whose constitutionality was challenged in Poe were "Connecticut statutes which, as authoritatively construed by the Connecticut Supreme Court of Errors, prohibit the use of contraceptive devices and the giving of medical advice in the use of such devices. In proceedings seeking declarations of law, not on review of convictions for violation of the stat-

which the plaintiff had exhumed and proffered to the court so that its invalidity might be declared and theoretical menace to plaintiffs abated. As basis for its rejection of plaintiff's plea for relief four justices of the court in *Poe* joined in the observation that the fact that the state "has not chosen to press the enforcement of this statute deprives these controversies of the immediacy which is an indispensable condition of constitutional adjudication." 367 U.S. at p. 508, 81 S.Ct. at p. 1758. The fifth justice whose concurrence was in the judgment alone does not in his brief memorandum evince a precise agreement with the language quoted.

The thrust of *Poe's* plurality opinion is in effect that whatever private conduct the several plaintiffs originally contemplated taking was in no realistic sense inhibited by the existence of a statute which by "tacit agreement" the Connecticut prosecutors had undertaken not to enforce. The court in a collateral threat of such tenuity could find no significant deprivation by the state of life and liberty without due process of law.

It is otherwise where claims of abridgment of First Amendment freedoms to speak and publish are in question. The chill of a penal restraint on utterance blights those freedoms by its mere presence. "These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). "The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

While reported prosecutions under § 781–b have been infrequent,[6] this is not necessarily the measure of the effectiveness of the statute to rein in dissent.

A brief review of § 781–b in its mutations as successive legislatures from time to time revisited and strengthened the provision offers proof of the abiding faith of the law makers in its inhibitory force upon those whom it was intended to chasten. In its most recent form it survived, as Election Law § 457, a massive elision from the Penal Law of what was dead-letter and obsolete, and the effective date, a scant six months removed, betokens a censorial force that is far from spent.

As a penal neophyte (added by the L.1941, c. 198, effective Sept. 1, 1941,) the provision interdicted anonymity in respect of political literature which touched only the election of *public* officers and of candidates for nomination to *public* office.

Effective April 19, 1957, an amendment (L.1957, c. 717), brought within its lengthening reach the humble post card, and broadened obligatory self-disclosure to sponsorship of matter relative to propositions and amendments of the State Constitution to be voted upon at general elections.

An amendment enacted in 1962 by chapter 576 effective September 1st of the same year generated the version of the law to which the complaint sub jud. is addressed. The scope of the provision was by such amendment widened so that it would thereafter encompass

---

utes, that court has ruled that these statutes would be applicable in the case of married couples and even under claim that conception would constitute a serious threat to the health or life of the female spouse." 367 U.S. at p. 498, 81 S.Ct. at p. 1753. The Fourteenth Amendment alone was cited in the plurality opinion. First Amendment freedoms were not mentioned except in the dissents.

6. In addition to the Zwickler prosecution there are reported People v. Clampitt, 34 Misc.2d 766, 222 N.Y.S.2d 23 (Ct. of Spec. Sessions 1961); and North End Democratic Club v. Lefkowitz, Attorney General, 31 Misc.2d 1000, 222 N.Y.S.2d 9 (Sup.Ct. Special Term N.Y. County 1961).

within its roster of potential felons anonymous publishers and distributors, whereas earlier only printers and reproducers of what was circulated had been menaced. The circle of eligible beneficiaries of the statute as amended was, moreover, enormously expanded, for this was now to include *party* officials and candidates for *party* position as well.

Recodification of the 1966 Penal Law, earlier adverted to, brought in its wake redistribution of many special provisions found therein, and, not inappropriately, as part of these shiftings of locale, § 781–b was translated unchanged to its current situs in the Election Law.[7] The continuing vitality of legislative purpose is made manifest by such reenactment.

The attempt of defendant to moot the controversy and thus to abort a declaration of constitutional invalidity by citing the circumstance that the Congressman concerning whom the Zwickler handbill was published has since become a New York State Supreme Court Justice must fail. When this action was initiated the controversy was genuine, substantial and immediate, even though the date of the election to which the literature was pertinent had already passed. Zwickler had been arrested as he stood in a public street the week before the election, distributing handbills.[8] Their content was germane to the current political campaign. His had been a "citizen's arrest" made by an attorney-member of a political club located a scant 150 feet distant from where Zwickler had stationed himself to make such distribution. The Congressman-candidate was the district leader,—the office is an elective party position—, of this club. The attorney was a precinct captain of that club. He testified to the incident as follows:

He had asked Zwickler

"[w]ho gave you the authority to hand out, who printed this literature, who is the name of the sponsor?" He said, 'none of your business.'"

\* \* \* \* \* \*

"I said, well you know, you are violating the law. He said, if I am violating the law why'nt you have me arrested, so I said, well, I asked Mr. Levine to go and get an officer and asked the officer to make this civil arrest. They called the police station. The lieutenant and the sergeant came down with a police car and finally he consented to go into the police car and we went down to the police station and I made this arrest. When I came down there I said if he gives me his name and address and who sponsored this literature I will not make the complaint and he refused to do that and the lieutenant had no other alternative but to book him on this charge."

The charge was prosecuted on behalf of the state by an *Assistant District Attorney* of the county. Although the "offense" was committed on October 29, 1964, the case was not tried until December 11, 1964, weeks after the general election had been held. More weeks elapsed before, on February 10, 1965, Zwickler was adjudged guilty and sen-

---

7. Section 69 of the New York State Executive Law, McKinney's Consol.Laws, c. 18, confers upon an Attorney General of the State, whose office is elective and non-judicial, broad powers and duties respecting "crimes against the elective franchise." Although the statute vests him with no express authority to censor or to silence criticism, the chilling effect on first amendment freedom of expression through exposure of an anonymous critic to governmental investigative procedures and, if his identity is thereby ascertained, to prosecution for his anonymity though what he has uttered be unexceptionable, is manifest. Among an Attorney General's powers are those of investigation with authority to subpoena, of execution of warrants or arrest by appointees empowered to act as peace officers, and of invocation of assistance from members of the police, sheriffs and other public officers in achieving the objectives of the section.

8. Undisputed facts testified to before Criminal Court Judge Ryan as reported in New York Court of Appeals Record on Appeal. This document is before the Court without defendant's motion, which is accordingly, unnecessary, for leave to file it as an exhibit.

tenced. The punishment meted out by the court was 30 days imprisonment in the Workhouse. Sentence was suspended but its menace hung over him. For a like offense subsequently committed § 782 admonished him that he would be indictable on a felony charge.

In the appeal to the Appellate Term of the Supreme Court which followed, the state as respondent continued to be represented by the District Attorney. That court on April 23, 1965, reversed and dismissed, but explicitly failed to reach the question of constitutionality (see supra p. 246 and footnote appended). The prosecutor yet gave no hint of any abating of zeal. Further appellate consideration was not automatic, but was premised on leave being granted by a judge of the State Court of Appeals. Permission was applied for and obtained.

It was not until December 1, 1965, that the Court of Appeals by its affirmance, rendered without opinion and, hence, without reaching the constitutional question, upheld the action of the Appellate Term. Until it had done so, Zwickler would have been foolhardy indeed had he chosen to circulate political literature for the 1965 elections without certifying its provenance as § 781–b enjoined. Commission of a second and similar offense would, in the event the Court of Appeals restored the original judgment of conviction, have confronted Zwickler with the very real possibility that the trial judge would reinstate the 30 day sentence of imprisonment which he had suspended, and might have drawn a felony indictment as well.

The consequences thus evoked were too dangerous for Zwickler to ignore. He chose, as a prudent alternative to the martyrdom that he might have embraced, to file his current complaint in this court. The suit was begun with reasonable promptitude on April 22, 1966, less than five months after the Court of Appeals' inconclusive affirmance. It is seen, therefore, that no dilatoriness on his part has prolonged the chill of his first conviction. Indeed, our own abstention after he brought the action has markedly protracted his period of uncertainty.

Zwickler's complaint, quite properly, instances this seminal episode of harassment as illustrative of the impact upon him of an overbroad statute and as giving substance and immediacy to the threat of future inhibitory action which justify his demand for a declaration of invalidity. The fortuitous circumstance that the candidate in relation to whose bid for office the anonymous handbill was circulated had, while vindication inched tediously forward, removed himself from the role of target of the 1964 handbill does not moot the plaintiff's further and far broader right to a general adjudication of unconstitutionality his complaint prays for. We see no reason to question Zwickler's assertion that the challenged statute currently impinges upon his freedom of speech by deterring him from again distributing anonymous handbills. His own interest as well as that of others who would with like anonymity practise free speech in a political environment persuade us to the justice of his plea.

Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958), provides the rubric for our holding and a gloss upon it. In *Evers* the Supreme Court considered, and held appropriate for its determination, the claim of a Negro resident of Memphis, Tennessee, that he was entitled to a judicial declaration in his own behalf and for others similarly situated that he was authorized in the exercise of a constitutional right to travel on a bus without being subjected under state law to segregated seating arrangements because of race. He had boarded the bus on only a single occasion, admittedly to test that right, and had left the bus when threatened with arrest for essaying to exercise it.

Despite the inchoate nature of his experience the court accepted jurisdiction and struck down the provision as invidious. The standard *Evers* articulates is not, however, to be limited to the particular rights it vindicates. With a broader reach and by necessary logic it

draws beneath its protective canopy the grievances of those who are subjected by statute to special disabilities in the exercise of First Amendment freedoms as well. The aborting of the incident which was cited as illustrating the invasion of the right in *Evers* did not abate the "actual controversy." This was held to be substantial and persistent until it should be resolved by the declaration solicited by petitioner. So long as the right remained unvindicated, he preserved "a substantial, immediate, and real interest in the validity of the statute which imposes the disability" and was entitled to have that right adjudged. 358 U.S. at p. 204, 79 S.Ct. at p. 179, citing Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956).

The underlying controversy does not cease to serve as a predicate for such judicial declaration notwithstanding that the plaintiff halts his challenge short of arrest, as in *Evers*, nor of a second arrest as in the case of Zwickler. "We do not believe that appellant, in order to demonstrate the existence of an 'actual controversy' over the validity of the statute here challenged," the *Evers* opinion reads (358 U.S. p. 204, 79 S.Ct. p. 179), "was bound to continue to ride the Memphis buses at the risk of arrest if he refused to seat himself in the space in such vehicles assigned to colored passengers."

 The declaratory judgment action is designed precisely to give one, potentially a defendant in a criminal prosecution, access to a judicial determination prior to actual arrest when the facts indicate a sufficient basis for his belief that conduct he deems protected under the First Amendment will subject him to such prosecution.

Reaching, accordingly, the plaintiff's challenge to the constitutionality of § 781–b, we turn to a consideration of his contention that the statute is impermissibly "overbroad" in that it imposes its obligations and sanctions indiscriminately upon those whose writings politically circulated fall within the protection of the First Amendment and those who, by the criminal content of their text, have placed themselves outside the pale of such protection. The supplemental brief defendant now submits concedes that the statute does indeed make no distinction between the two groups.[9] Thereby the Attorney General yields as no longer tenable the position he earlier maintained at the hearing before us that the overbroad statute could be reduced to a constitutional dimension by reading into it attenuating decisions of the state courts yet to be rendered. By such judicial snipping and cropping the state's attorney hoped ultimately so to circumscribe the statute's intent that only such political literature as was criminally libelous would be brought under constraint to disclose sponsorship. For those who were appropriately discreet in their political criticism, or, for that matter, in according praise and approval, the statute in express terms being operative as to both pro and con, anonymity would be lawful and go unwhipped. Thus the requisite narrowing of the statute to satisfy First Amendment proscriptions would, hopefully, be achieved.

The legislative and judicial syllogism which led the Attorney General to propose such argument initially, and now compels him to abandon it in favor of his current thesis that anonymity alone suffices in a political context to delineate the misdemeanor-felony irrespective of the

9. The footnote, defendant's brief p. 17, reads with emphasis of the original preserved:

"Defendant does not contend, as plaintiff appears to suggest, that the statute's reach is *limited* to scurrilous or libelous literature. The statute, by its terms, does not attempt to assess the nature of the language published and does not promulgate any standards other than anonymity. The statute applies to all anonymous *campaign* literature. As will clearly appear, *infra*, the evil aimed at is anonymity and it is not the purpose of the statute to prevent *any* kind of utterance. The public is entitled to know the source of any campaign utterance. Plaintiff's contention, therefore, that the statute is 'overbroad' is wholly untenable."

truth or falsity of what is circulated, is clear, but at the same time provides its own refutation. Central to defendant's dilemma is Talley v. State of California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed. 2d 559 (1960), the force of which cannot be limited to the answer the court gave to the factual question posed to it, namely, "whether the provisions of a Los Angeles City ordinance restricting the distribution of handbills 'abridge[s] the freedom of speech and press secured against state invasion by the Fourteenth Amendment of the Constitution.'"

The city's counsel had urged as underpinning constitutionality "that this ordinance is aimed at providing a way to identify those responsible for fraud, false advertising and libel. Yet," the court rejoined, "the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose." The opinion is, however, quick to disclaim any implication that an ordinance thus conceived and focused would survive the constitutional challenge if made. The opinion continues (362 U.S. at p. 64, 80 S.Ct. at p. 538):

"[W]e do not pass on the validity of an ordinance limited to prevent these or any other supposed evils. This or-

dinance simply bars all handbills under all circumstances anywhere that do not have the names and addresses printed on them in the place the ordinance requires.

"There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Lovell v. City of Griffin, 303 U.S. [444] at page 452, 58 S.Ct. [666] at page 669 [82 L.Ed. 949]." [10]

Two years after it was decided the courts of New York State were themselves to read the *Talley* teachings in such expansive sense. In People v. Mishkin, 17 A.D.2d 243, 234 N.Y.S.2d 342, (1st Dept. 1962), aff'd without opinion, 15 N.Y.2d 671, 255 N.Y.S.2d 881, 204 N.E.2d 209 (1964), section 330, subd. 2 of the state's General Business Law, McKinney's Consol. Laws, c. 20, came under their consideration. The provision as then in force required that *every* publication other than newspapers and magazines should "conspicuously have imprinted * * * the true name and address of the publisher or printer."

---

10. Justice Black, delivering the brief opinion in Talley, provides an eloquent historical note which adumbrates the path the Court has in the eight intervening years traversed and lights the way for its future libertarian course. The note reads, (id. pp. 64 and 65, 80 S.Ct. p. 538):

"Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. The old seditious libel cases in England show the lengths to which government had to go to find out who was responsi-

ble for books that were obnoxious to the rulers. John Lilburne was whipped, pilloried and fined for refusing to answer questions designed to get evidence to convict him or someone else for the secret distribution of books in England. Two Puritan Ministers, John Penry and John Udal, were sentenced to death on charges that they were responsible for writing, printing or publishing books. Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. Along about that time the Letters of Junius were written and the identity of their author is unknown to this day. Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes."

The Appellate Division in a brief memorandum which affirmed a finding of Mishkin's guilt under counts not here pertinent charging violation of an obscenity statute voided his conviction as to other counts filed under the General Business Law. The court grounded the reversal on a determination that § 330, subd. 2 was unconstitutional under constraint of *Talley*. The *Mishkin* memorandum contained an obiter which the legislature, as noted shortly, later construed as a guide for an amendment which by mitigating the force of the original provision placed it, hopefully, beyond the strictures of the Talley teachings. The Appellate Division's comment read:

"The District Attorney suggests that the statute may be found constitutional if its application is limited to obscene publications for there would be a purpose in facilitating the discovery of the publisher. But the statute itself is not so limited, and there is nothing to indicate that this was the legislative purpose. We do not reach the question whether such a purpose would validate the statute."

Taking the negative expression in the final sentence of the Mishkin dictum quoted above as an affirmation of its converse, which it assuredly was not, the legislature proceeded to amend the second subdivision of § 330 so that its mandate and the sanctions for violation were thereafter to be operative upon only such writings as were "composed or illustrated as a whole [so] as to be devoted to the description or portrayal of bondage, sadism, masochism or other sexual perversion or to the exploitation of sex or nudity." These writings, but not those free of the taint described, were under the statute required to set forth at the end of the published matter the name and address of the publisher or printer.

Whether the Mishkin-prompted amendment, upon the validity of which the courts of the state do not appear as yet to have ruled, will be able to withstand further *Talley* oriented attacks does not here concern us, for § 781–b, the provision we review, has been subjected to no such narrowing. The legislature has not amended it, nor has any court interpreted it in such fashion that anonymity is to be penalized only as to hardcore foulness which the First Amendment will not protect.

Defendant's problem has, indeed, been compounded by a negative legislative action. For the same recodification of the Penal Law, effective September 1, 1967, which transferred § 781–b to the Election Law, therein to be renumbered § 457, has through omission repealed without comment the ancient provisions which theretofore constituted and delineated the crime of libel.[11] One may now, therefore, in the State of New York with a curious impunity, save for exposure to a claim for civil damages, circulate an anonymous tract which falsely charges a clergyman with adultery, but one dare not in an anonymous handbill truthfully publicize the sale of elective office lest he be held to answer criminally.

Anonymity alone, according to defendant, is the touchstone of the offense, but only if perpetrated in a political environment. Government assistance to a public figure, however, in ferreting out a "traducer" whom he may the more readily identify and from whom he may seek civil damages as balm for his individual smart at criticism of his official performance weighs in the balance as too high a toll to

---

11. The sections thus omitted from the revision of the Penal Law are with their descriptive headnotes the following: § 1340—Libel defined; § 1341, Libel a misdemeanor; § 1342, Malice presumed; defense to prosecution; § 1343, Publication defined; § 1344, Liability of editors and others; § 1345, Publishing a true report of public official proceedings; § 1346, Privileged communications: § 1348, Furnishing libelous information; § 1349, Furnishing false information.

Only Penal Law § 1347 is preserved, but, renumbered § 155.05(2), is transferred to Article 155, "Larceny," of the Revised Penal Law. In new associations it is with extensive paraphrase brigaded with offenses falling generally within the definition of extortion effected by speech or silence.

be exacted from First Amendment freedom of expression for all. The freedom to animadvert upon public figures and affairs primes all others.

Nor does it avail defendant to urge upon us that § 781–b "protects the integrity of the electoral process * * * by facilitating the enforcement of various anti-corruption provisions in the Election Law." [12]

The provisions of that law which the brief brings forward as the strongest it can muster in justification of this undercutting of the First Amendment focus on matters unrelated to the "protected liberties", and, so to speak, tangentially abrade them. Sections 320 through 328, the first of those cited by the Attorney General, comprise Article 13 of the Election Law, which is captioned "Campaign Receipts, Expenditures and Contributions". They contain directions for the filing at specified intervals by political committees, candidates and other persons of relevant statements.

The other sections tendered as support were transferred from their original home in the Penal Law under the revision effective September 1, 1967, and now are incorporated in Article 16, a new division of the Election Law, entitled "Violations of the Elective Franchise." Nothing in their content indicates a direct legislative purpose that implementation of these administrative regulations touching the exercise of the elective franchise shall diminish or erode the major First Amendment right to speak freely in political matters. Of these provisions § 447 denounces and penalizes political assessments on public employees; § 454 forbids candidates for judicial office, and § 460, corporations, to make political contributions.

It is true—if one were to follow defendant's reasoning—that were every col-

---

12. The Attorney General adduces § 612 of 18 U.S.C. designed to "enforce other provisions of the Federal Corrupt Practices Act, 2 U.S.C. §§ 241–256", as furnishing by its mere existence a constitutional prop for § 781–b, a provision of like import. The history he cites for the federal enactment is unhelpful. It consists of Attorney General Francis Biddle's brief letter dated April 7, 1944, addressed to the Chairman of the Committee on the Judiciary of the Senate, responsive to the Senator's request for the Justice Department's views concerning the bill. This he summarizes as one "to provide that no person shall publish or distribute any political statement relating to a candidate for election to any Federal office which does not contain the name of the person responsible for its publication or distribution."

Noting without elaboration that the proposed law "would implement the Federal Corrupt Practices Act" and "tend to facilitate the enforcement of the provisions of that act, especially those which require reports of expenditures and contributions" and of the Hatch Act (then 18 U.S.C. § 61m) limitation of $5,000 on contributions in connection with Federal elections, Mr. Biddle's letter announced: "I find no objection to the enactment of the bill." The Senate report to which the letter is appended provides no history of its own, but rests its approval of the bill on the Biddle letter. The report prefaces the Attorney General's ex cathedra with the following uninformative comment: "The Department of Justice having considered the legislation reports an *analysis* in the following letter:" (S.Rep. No. 1390, 78th Cong. 2d Sess., 2 (1944).) (Emphasis added.)

As the Senate report says too little, so the report of the "President's Committee on Civil Rights, to Secure These Rights," pp. 51–53 (1947), an additional document cited indefinitely by defendant in this context, says too much. It propounds the thesis that "the volume and skill of modern propaganda make identification of the source of an argument essential to its evaluation." Decrying the circulation of "anonymous hate-mongering or other subversive literature" the extent of which it acknowledges it does not know, the Committee declares its belief that the "principle of disclosure is * * * the appropriate way to deal with those who would subvert our democracy by revolution or by encouraging disunity and destroying the civil rights of some groups."

Talley disagrees, and the Congress has, in the score of years that have passed since these views of the Committee were expressed, made no move to implement them.

porteur constrained by statute to disclose whose money it was that paid the printer of the tract he hawks, the information thus extruded might in some instances blaze a trail to a criminal source or misuse of funds. A constitutional right of those privileged to speak with anonymity unbreached, however, may not be disregarded to facilitate the prosecution of others who by their offending may have forfeited that right.

The current attitude of the Courts is to place the emphasis on the protection and preservation of the freedom of the many to advocate conduct or to reprehend misconduct in public affairs, not to redress the wrongs, real or fancied, of the individual office holder or aspirant, for what is uttered concerning his past or prospective management of those affairs.

"[N]either factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct." New York Times Co. v. Sullivan, 376 U.S. 254, 273, 84 S.Ct. 710, 722, 11 L.Ed.2d 686 (1964). Indeed with libel no longer a crime, the civil claim asserted in a political context is well-nigh moribund, surviving only when the officer whose official conduct is aspersed can demonstrate an actual malice in the false speaking. (id. p. 283, 84 S.Ct. p. 727). But the threat which chills free expression remains, "the fear of damage awards * * * may be markedly more inhibiting than the fear of prosecution under a criminal statute". (id. p. 277, 84 S.Ct. p. 724, citing City of Chicago v. Tribune Co., 307 Ill. 595, 607, 139 N.E. 86, 90, 28 A.L.R. 1368 (1923)).

The more efficient administration of the ancillary procedures which concern the Attorney General must give room to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." (id. p. 270, 84 S.Ct. p. 721, citing Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 and De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278).[13]

*Talley* declares (80 S.Ct. p. 539) that the Los Angeles ordinance which it invalidated "like the Griffin, Georgia[14] ordinance, is *void on its face.*" [Emphasis supplied.] The Los Angeles provision banned distribution of handbills which did not identify their source. Registration of the distributor with the municipality, however, was not commanded. The *Griffin* ordinance, on the other hand, while stipulating that a license be obtained before the printed matter was disseminated, did not outlaw anonymity of the sponsor.[15] *Talley's* reading of *Griffin* was that the Court in *Griffin* had similarly "held *void on its face* an ordinance that comprehensively forbade any distribution of literature at any time or place in Griffin, Georgia, without a license." (80 S.Ct. p. 537) [Emphasis supplied.]

*Talley* thus assimilates, as equally invalid on their face, provisions which merely bar anonymity and those which require licensing of matter which is constitutionally protected.

*Talley* cites Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed. 2d 480 (1960), and N. A. A. C. P. v. State of Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), by contrast as illustrative of invalidity, not on the face of a statute, but as generated by the *application* of the statute. Recognizing

13. Cf. Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), in which the Supreme Court extends the New York Times principle so as to bring down the Louisiana criminal libel statute upon parallel reasoning.

14. Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

15. The ordinance does not appear to have precluded the preservation of anonymity despite the licensing procedure it established. Application by an attorney or agent for an undisclosed principal for the license was a procedure not inconsistent with the intent of the indefinitely worded provision.

that the statute was enacted within a field of legislative competence, the Court nevertheless ruled it must be stricken as cutting too deeply into the favored First Amendment enclave. The *Talley* opinion brackets its citation of *Bates* and *N. A. A. C. P.* with a comment which marks the "void-on-face" as a distinct category from that of the "void by reason of application". Such comment reads:

"We have recently had occasion to hold in [these] two cases that there are *times* and *circumstances* when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified. [citing *Bates* and *N. A. A. C. P.*]. The reason for those holdings was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." [Emphasis supplied.]

In *Bates* the government had demanded the membership lists of the *N. A. A. C. P.* in ostensible aid of its power as a municipality to tax a business within its corporate limits. The Court, recognizing the taxing power as basic to the ultimate purpose and function of government, nevertheless, found the legislative action so "significantly to impinge upon constitutionally protected freedom [that] it becomes the duty of this Court to determine whether the action bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification." In the companion *N. A. A. C. P.* case the Association successfully resisted a governmental demand that it open up for judicial visitation the corporate roster of its members and contributors.

The Attorney General's argument here that a sufficient justification may be found for overriding First Amendment freedoms in the benefit that would accrue to the authorities charged with the duty of investigating corrupt practices in election campaigns receives an answer in the *N. A. A. C. P.* case at page 461 of 357

U.S., at page 1171 of 78 S.Ct., the opinion at that point reading:

"Similar recognition of possible unconstitutional intimidation of the free exercise of the right to advocate underlay this Court's narrow construction of the authority of a congressional committee investigating lobbying and of an Act regulating lobbying, although in neither case was there an effort to suppress speech. United States v. Rumely, 345 U.S. 41, 46–47, 73 S.Ct. 543, 546, 97 L.Ed. 770; United States v. Harriss, 347 U.S. 612, 625–626, 74 S.Ct. 808, 815–816, 98 L.Ed. 989. The governmental action challenged may appear to be totally unrelated to protected liberties. Statutes imposing taxes upon rather than prohibiting particular activity have been struck down when perceived to have the consequence of unduly curtailing the liberty of freedom of press assured under the Fourteenth Amendment. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Murdock v. [Com. of] Pennsylvania, 319 U.S. 105, 63 S. Ct. [870] 891, 87 L.Ed. 1292."

*Harriss,* cited by defendant,[16] and the companion *Rumely* case are noted in the foregoing excerpt only to stress the limited authority of a state to intrude upon First Amendment freedom of utterance. The cases are seen to concern special situations in which within a narrowly limited area encroachment upon First Amendment anonymity is tolerated so that an exigent national interest may be safeguarded. Beyond the bounds delineated, encroachment confronts an insurmountable bar in that Amendment. And it is in this outer precinct of freedom that § 781–b assumes, and, hence, impermissibly to function.

In *Rumely,* respondent, an officer of an organization engaged in the sale of books of a "particular tendentiousness", had refused to disclose to a "House Select Committee on Lobbying Activities" the names of those who made bulk purchases

---

16. The defendant's brief characterizes Harriss as presenting "the most analogous situation to that in the instant case."

of his books for further distribution. To the Committee the lower house had delegated the task of investigating "all lobbying activities intended to influence, encourage, promote, or retard legislation." The extent of "the controlling charter of the committee's powers" came into consideration by the Court in its review of Rumely's conviction for his alleged contempt in the context outlined. Specifically, the terms "lobbying" and "lobbying activities", undefined in the Act, were, according to the Court, necessarily to be delimited to avoid "serious constitutional questions."

"Surely it cannot be denied", the Court's opinion observes, "that giving the scope to the resolution for which the Government contends, that is, deriving from it the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process, raises doubts of constitutionality in view of the prohibition of the First Amendment." 345 U.S. 41, 46, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953).

Those doubts the Supreme Court laid to rest by adopting the restrictive meaning the Court of Appeals had ascribed to the enactment, namely that it was to be held applicable only to "representations made directly to the Congress, its members or committees." If "lobbying" as the term is used in the resolution were to be interpreted as compassing "attempts 'to saturate the thinking of the community'" and "to cover all activities of anyone intending to influence, encourage, promote or retard legislation" the constitutional infirmity sought to be avoided would arise.

The *Harriss* case concerned a related juridical area, that of violation of the Federal Lobbying Act, (60 Stat. 812, 839; 2 U.S.C. §§ 201–270). It instances a parallel judicial pruning designed to bring a disclosure statute too diffusive in its scope within constitutional bounds. Read literally, the registration requirements of the Act were broadly imposed upon all persons whose activities were purposed "[t]o influence, directly or indirectly, the passage or defeat of any legislation by the Congress." As in *Rumely* the *Harriss* opinion held (347 U.S. p. 623, 74 S.Ct. p. 815) that "the intended method of accomplishing this purpose must have been through direct communication with members of Congress", and that the reach of the Act as thus foreshortened does not in its other provisions "violate the freedoms guaranteed by the First Amendment—freedom to speak, publish, and petition the Government." (id. p. 625, 74 S.Ct. p. 815).

The lobbyist may, accordingly, in an anonymity constitutionally protected, purvey his wares without penalty or restraint when his approach is to others than members of Congress.

American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L. Ed. 925 (1950), another case relied upon by defendant, concerns itself with the problem of Communist infiltration of the labor movement. This the Court found to present a danger to freedoms of speech, press and assembly so significant that these freedoms could in its view be preserved only if constitutional government itself were to survive. Protection against unlawful conduct and incitement to commit unlawful acts were held to constitute a vital national interest for survival. The safeguarding of that interest, accordingly, justified as constitutionally permissible so much of the Labor Management Relations Act, 1947, 29 U.S.C. § 159(h) as conditioned recognition of a labor organization on the filing of affidavits by its officers that they did not belong to the Communist Party nor believe in the overthrow of the government by force.

"When particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgement of speech,"—so reads the opinion of the Court (p. 399, 70 S.Ct. p. 684)— "the duty of the courts is to determine which of these two conflicting interests demands the greater protection

under the particular circumstances presented. The high place in which the right to speak, think, and assemble as you will was held by the Framers of the Bill of Rights and is held today by those who value liberty both as a means and an end indicates the solicitude with which we must view any assertion of personal freedoms. We must recognize, moreover, that regulation of 'conduct' has all too frequently been employed by public authority as a cloak to hide censorship of unpopular ideas. We have been reminded that 'It is not often in this country that we now meet with direct and candid efforts to stop speaking or publication as such. Modern inroads on these rights come from associating the speaking with some other factor which the state may regulate so as to bring the whole within official control.' "

Here the conduct which the legislature reprehends and undertakes to regulate by § 781–b is, without demarcation of the boundary between the two groups, the conduct of those who are in no sense culpable and that of those who are, or at least may be held so. No "vital national interest" cries out for protection through truncation of First Amendment rights when all the threat comes from a citizen's standing at a subway exit and peddling his tracts, be they religious, political, or whatever and sundry. Nor may freedom of utterance be stifled, though the street be littered by the rain of discarded handbills. Neither the distributors, nor the distribution, but only the litterer may be proceeded against for violation of the Sanitary Code. (Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Cf. Wolin v. Port of New York Authority, 2d Cir., 392 F.2d 83, decided March 1, 1968.) "[R]egulation of 'conduct' has all too frequently been employed by public authority as a cloak to hide censorship of unpopular ideas," American Communications Ass'n v. Douds, supra, 339 U.S. at page 399, 70 S.Ct. at page 684, admonishes us.

The tide of judicial thinking floods too strongly today in the estuary of First Amendment freedom for any tributary of government power in its exercise to overbear it.

Thus we see the Supreme Court when it revisited the troublesome Subversive Activities Control Act in 1967, in United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), with a broad stroke sweeping into the discard a major fraction of that Act. It was an unconstitutional proscription of the First Amendment right of association, the Court held, for a statute, overbroad in its abridgement of such right, to make it unlawful for a member of a Communist-action organization to engage in any employment in any defense facility. The statute, the Court declared, could not without substantial rewriting of its clear and precise provisions be narrowed to a constitutional scope. The statute "contains the fatal defect of overbreadth because it seeks to bar employment both for association which may be proscribed and for association which may not be proscribed consistently with First Amendment rights." (Citing cases.) In summation, "when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms." (Citing cases.)

Lamont v. Postmaster General of United States, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398, decided in 1965, marches abreast with *Robel* and *Griswold* [Griswold v. State of Connecticut, 381 U. S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510] in rejecting earlier views [17] of the Court in this area. *Lamont* struck down a federal statute which required the department to detain and destroy unsealed mail from foreign countries determined to be communist political propaganda unless the addressee had returned a reply card sent him by the postal authorities in-

17. See Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190 (1912).

dicating his desire to receive such piece of mail. The Court, resting its determination "on the narrow ground that [inasmuch as] the addressee in order to receive his mail must request in writing that it be delivered" ruled that the requirement amounted "to an unconstitutional abridgment of the addressee's First Amendment rights." The "affirmative obligation" to act in order to have mail released to the addressee "is almost certain to have a deterrent effect, especially as respects those who have sensitive positions. * * * [A]ny addressee is likely to feel some inhibition in sending for literature which federal officials have condemned as 'communist political propaganda.' The regime of this Act is at war with the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment. New York Times Co. v. Sullivan, 376 U.S. 254, 270 [84 S.Ct. 710, 11 L.Ed.2d 686]."

The case of Mills v. State of Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), matches these others in providing a bench mark for the cresting flood. In *Mills* it appeared the legislature had assumed to promulgate a rule of "fair play" in the solicitation of votes by barring electioneering on the day the election was to be held. To hold that a newspaper editor who was charged with having wielded his pen on the forbidden day thereby rendered himself amenable to the sanctions of the statute, the State Supreme Court found itself forced to construe the provision as a valid exercise of the State's police power. The press "restriction, everything considered, is within the field of reasonableness," and "not an unreasonable limitation upon free speech." 278 Ala. 188, 195, 196, 176 So. 2d 884, 890.

The Supreme Court's views were briefly expressed and vigorously to the contrary. "Whatever differences may exist about interpretations of the First Amendment", it generalized, "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." And specifically: "It is difficult to conceive of a more obvious and flagrant abridgement of the constitutionally guaranteed freedom of the press."

It brushed aside as of no moment the state court's apology that the statute was

"a salutary legislative enactment that protects the public from confusive last-minute charges and countercharges and the distribution of propaganda in an effort to influence voters on an election day; when as a practical matter, because of lack of time, such matters cannot be answered or their truth determined until after the election is over."

No "test of reasonableness" serves to save the "state law from invalidation as a violation of the First Amendment."

■ Penal Law § 781–b, and its successor, Election Law § 457, are, accordingly, adjudged invalid as an abridgement of rights secured by the First Amendment, and injunctive relief to implement such declaration of invalidity is decreed.

For reasons which appear from the foregoing and for want, in any event, of materiality in what the Attorney General, as movant, seeks leave to submit, his application that he be permitted to file a supplemental affidavit and the exhibit he annexes thereto is denied. The record on appeal to the state Court of Appeals on Zwickler's conviction is already before us.