Burton B. Roberts, J.
This is a motion by the defendants pursuant to CPL 210.25 (subd. 3) to dismiss the indictment against them on the grounds that the statute they are charged with violating substantively and with conspiring to violate, section 457 of the Election Law of the State of New York, is uncon *950 ■stitutional under both the Federal and New York' State ■Constitutions.[1]
The indictment charges that the defendant Perry B. Duryea, Jr., the Speaker of the Assembly of the State .of New York, and two of his aides, the defendants Henry A. Mund (Executive Assistant to the ¡Speaker) and I. Lynn Mueller (Special Assistant to the Speaker), together with the defendant John E. Kingston, the Majority Leader of the Assembly, and the defendant Alfred A. Belli Bovi, a Member of the Assembly, conspired to promote the election of certain candidates to the Assembly in 1972 by means of acts constituting a violation of section 457 of the Election Law (said conspiracy itself constituting a violation of section 446 of the Election Law). The indictment also charges that these defendants committed the substantive crime of violating section 457 of the Election Law.
According to the indictment, during a period of several months prior to the general election of 1972 there was in existence a political committee, known as the 1972 Republican Assembly Campaign Committee, with the objective of promoting the election of Republican candidates for the Assembly in that election. The defendant Kingston was the chairman of this committee, the defendant Mund was its treasurer, and the defendant Duryea maintained ultimate authority over all its political and financial decisions.
The indictment alleges that the defendants, on behalf of this committee, in order to promote the election of Republican candidates for the Assembly in the 1972 election in 12 “ marginal ” assembly districts (districts where an analysis by defendants allegedly revealed that any “appreciable” support for the Democratic candidate would cause the defeat of the Republican candidate), planned and carried out a scheme to distribute approximately 80,000 printed letters to enrolled Liberal Party voters in these districts, urging them to vote for the Liberal Party assembly candidates.
Part of this scheme, the indictment states, was to conceal the true source of these letters, which was the Republican Assembly Campaign Committee, by having the letters bear the signature of one Harold J. Relkin, over the designation ‘c Chairman, Action Committee for the Liberal Party”. It is alleged that Relkin, *951 a resident of New Jersey, was neither a registered voter in New York nor held any office or title in the Liberal Party; that the purpose of the scheme was to encourage Liberal Party voters to vote their party affiliation, thereby promoting the election of the Republicans; that in each of the 12 districts chosen, some 6,500 copies of the letters were to be distributed; and that the letter was in fact disseminated in the last week of October, 1972, shortly before the election.
The statute that is the center of attention in this case is a relatively esoteric one, and should therefore be set forth at the outset. It provides as follows:
§ 457. Printing or other reproduction of certain political literature.[2] No person shall print, publish, reproduce or distribute in quantity, nor order to be printed, published, reproduced or distributed by any method any handbill, pamphlet, circular, post card, placard or letter for another which contains any statement, notice, information, allegation or other material concerning any political party, candidate, committee, person, proposition or amendment to the state constitution whether in favor of or against a political party, candidate, committee, person, proposition or amendment to the state constitution, in connection with any election of public officers, party officials, candidates for nomination for public office, party position, proposition or amendment to the state constitution without also printing or reproducing thereon legibly and in the English language the name and post-office address of the printer thereof and of the person or committee at whose instance or request such handbill, pamphlet, circular, post card, placard or letter is so printed, published, reproduced or distributed, and of the person who ordered such printing, publishing, reproduction or distribution, and no person nor committee shall so print, publish, reproduce or distribute or order to be printed, published, reproduced or distributed any such handbill, pamphlet, circular, post card, placard or letter without also printing, publishing, or reproducing his or its name and post-office address thereon. A violation of the provisions of this section shall constitute a misdemeanor.
“ The term 'printer’ as used in this section means the principal who or ¡which by independent contractual relationship is responsible directly to the person or committee at whose instance or request a handbill, pamphlet, circular, post card, placard *952 or letter is printed, published, reproduced or distributed by such principal, and does not include a person working for or employed by such a principal. ’ ’
The grounds for defendants’ constitutional claims are that section 457 violates the First Amendment freedoms of speech and association and of the press, the Fourteenth Amendment Due Process Clause, and the comparable provisions of the New York State Constitution (art. I, §§ 8 and. 9, and art. I, § 6, respectively). The applicable portions of these constitutional provisions are set forth in the margin.[3]
The broad principles of constitutional law applicable to the attack on section 457 on First Amendment grounds shall initially be summarized.
The First Amendment is the darling of the Constitution’s nursery. Freedom of! speech, it has been stated, “ is the essence of self-government.” Garrison v. Louisiana (379 U. S. 64, 74.) Consequently, to whatever extent the law has established the gradation of constitutional rights, the First Amendment is held to occupy a “ preferred position ” among the various guarantees of liberty. (Saia v. New York, 334 U. S. 558, 561-562 ; cf. Kovacs v. Cooper, 336 U. S. 77, 90-96, concurring opn. per Frankfurter, J.)
The term ‘ ‘ preferred position” has two facets. It imports the weighty consideration that First Amendment freedoms must be accorded in balancing them against the countervailing interests which are alleged to underlie encroaching statutes. It also means that the First Amendment has a character transcendent of mere parties and controversies in litigation. It is more than another rule of law that is the means to a just result. The pursuit of its highest aims is an end in itself.
*953 To attempt a further grading of rights to those within the First Amendment is an unnecessary exercise; for, as Jefferson noted, the Framers “ ‘ guard [ed] in the same sentence, and under the same words, the freedom of religion, of speech, and of the press: insomuch, that whatever violates either, throws down the sanctuary which covers the others’” (8 Jefferson, Works 46A-465 [Ford, ed., 1904], quoted in Time, Inc. v. Hill, 385 U. S. 374, 400, n. 2 [Black, J., concurring]). Nevertheless, the free discussion of political affairs must be considered as among the most carefully protected of our liberties. It has been said that ‘ ‘ there is practically universal agreement that a major purpose of [the First] Amendment was to protect free discussion in government affairs” (Mills v. Alabama, 384 U. S. 214, 218-219), and that we have a “ profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open ”. (New York Times Co. v. Sullivan, 376 U. S. 254, 270.)
The primacy of the First Amendment, however, is not absolute. It was settled long ago that the Constitution does not provide for an unfettered right of expression. (See Schenck v. United States, 249 U. S. 47 [Holmes, J.].) First Amendment freedoms are vital, but their exercise must be compatible with the preservation of the other essential rights of a free society which enjoys competing interests. (See Pennekamp v. Florida, 328 U. S. 331, 352-355 [concurring opn. per Frankfurter, J.]; Dennis v. United States, 341 U. S. 494, 522.) Even the right of free expression in political matters does not exist insurmountably. (Civil Serv. Comm. v. Letter Carriers, 413 U. S. 548; Dennis v. United States, supra.)
The eminence of free speech is such, however, that “ only a compelling state interest in .the regulation of a subject within the State’s constitutional power to regulate can justify limiting First Amendment freedoms.” (N.A.A.C.P. v. Button, 371 U. S. 415, 438.) What this means, in terms of this or any constitutional challenge to a statute on grounds of the First Amendment, is that the magnitude of the State interest underlying the regulation must be balanced against the impact of the regulation on freedom of speech, with the scales pre-weighted by virtue of the importance of the First Amendment so that the State interest, where it exists, must be “compelling”. With a preliminary caveat as to the limitations of formulae of this sort, it may be safely said that the impact of a regulation on freedom of speech (and hence the magnitude of the State interest necessary to override it) varies with two main factors: *954 the type of regulation itself and the character of the activity at which the regulation is aimed. With regard to the regulation itself, prior restraints on free expression in the form of censorship (Near v. Minnesota, 283 U. S. 697), or discretionary licensing requirements tending toward discriminatory enforcement (Thornhill v. Alabama, 310 U. S. 88), occupy the first position on the First Amendment’s enemies list. They bear the heaviest presumption of invalidity and require the most overwhelming interests to justify them. (New York Times Co. v. United States, 403 U. S. 713.) Following closely behind, however, are penal ¡statutes, which chill free expression by their mere existence. ‘1 These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions.” (N.A.A.C.P. v. Button, 371 U. S. 415, 433, supra.) With regard to the character of the behavior sought to be regulated, it is clear that the impact of the regulation on free expression increases as the object of regulation refines from conduct accompanying the communication of ideas and incidental thereto, i.e., “ speech plus ” (e.g. Cox v. Louisiana, 379 U. S. 536 [civil rights demonstration obstructing traffic] to the communication itself, i.e., “pure speech”; e.g. Herndon v. Lowry, 301 U. S. 242 [advocating communist doctrine]).
The “preferred position” concept also requires something more than the rule that an exigent need is necessary to justify a statute which infringes upon free speech, and that is this: even where the clearly compelling ¡State interest exists, the essential character of the amendment itself mandates that the regulation be carefully drawn ,so that the deterrent effect on free speech is no greater than absolutely necessary to foster the compelling interest necessitating the statute. (Cantwell v. Connecticut, 310 U. S. 296, 307.) Put another way, such a statute ‘ ‘ must be narrowly tailored to further the State’s legitimate interest.” (Grayned v. City of Rockford, 408 U. S. 104, 116-117.) If the provision is not so “ narrowly tailored ”, but instead, its prohibitions overflow into other areas protected by the First Amendment, the statute is unconstitutional “ on its face ’ ’, or, as it has been termed, ‘ ‘ unconstitutionally over-broad ”. (Grayned, supra; see Shelton v. Tucker, 364 U. S. 479, 488.)
The exalted position of the First Amendment as an end in itself, therefore, makes constitutional assaults on overly broad statutes under the First Amendment an exception to the general rule of standing that parties as against whom a statute may *955 constitutionally be applied ¡will not be heard to challenge the statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court. (United States v. Raines, 362 U. S. 17.) In order to uphold the “ preferred position ” of free speech and the concomitant rule that statutes attempting to restrict or burden the exercise of the First Amendment must be narrowly drawn to represent only the greater interest, the traditional rules of standing are altered, in the First Amendment area, to permit attacks on overly broad statutes “ with no requirement that the person making the attack demonstrate that his own conduct could, not be regulated ,by a statute drawn with the requisite specificity.” (Dombrowski v. Pfister, 380 U. S. 479, 486.) Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute’s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.” (Broadrick v. Oklahoma, 413 U. S. 601, 612.)
The overbreadth standing doctrine, however, cannot be considered absolute either. Its function in protecting the aims of the First Amendment, and, therefore, the extent of its application by the court has been held to attenuate as the regulated behavior “moves from ‘ pure speech ’ towards conduct ”. (Broadrick v. Oklahoma, 413 U. S. 601, 615.) Facial overbreadth claims are most compelling where statutes seek to regulate ‘ ‘ pure speech ’ ’ or to restrict the time, place and manner of expression of communicative conduct. But where conduct with a merely incidental relationship to speech is involved, the over-breadth in order to be dispositive “must not only be real, but substantial as well, judged in relation to the statute’s plainly legitimate sweep.” (Broadrick v. Oklahoma, 413 U. S. 601, 615, supra.)
With the facts thus cited and the law thus summarized, the shape of this classic First Amendment test emerges. The attack on section 457 may be conceived as a two-phased assault. The first is a claim that the behavior here alleged is protected by the First Amendment, and that section 457, which purports to forbid it, is “ unconstitutional as applied ” to these facts. The second phase is a retreat from the first claim to the alternative contention that even if a proper statute, narrowly drawn to forbid the behavior alleged, would survive First Amendment scrutiny, the statute being attacked here unnecessarily and improperly sweeps within its prohibitions other activity that *956 is protected by the First Amendment, and is therefore unconstitutionally overbroad. Attached to this second claim is the assumption that the defendants via the overbreadth doctrine, have the standing to challenge the statute as such and, if successful, reap the victory of a dismissal of the charges as a consequence of the striking down of the statute.
The First Amendment defense of this statute is correspondingly a dual one, with the loss of either round spelling defeat for the statute. In the first instance, the argument is that the conduct alleged must be regulated in favor of an overriding interest and therefore is not protected by freedom of speech. Then the full impact of the statute on free expression must be justified by an exigent need which compels the regulation, or, in the alternative, it must be established that the attacking party lacks standing to raise the statute’s overbreadth because its strictures apply more to conduct incidental to speech than to speech itself.
Turning, therefore, to .the first phase of this contest, the question is whether the defendants ’ alleged behavior is protected by the First Amendment or whether, to the contrary, it may be constitutionally legislated against. At this stage, defendants can offer no more than a masked retreat. They claim that section 457 is not valid as applied to the facts presently alleged.[4] They state that all allegations of falsity and misrepresentation are “ irrelevant ” since these “ are not crimes under any New York statute dealing with campaign literature.”[5] They conclude that ‘ ‘ the charge here is simply that [they] distributed campaign literature urging that certain individuals be elected to the Assembly, and did so without signing their names.” “ [E]very citizen in this country ”, they urge, “ has the absolute constitutional right to do just that.”[6]
It is a clever argument, that avoids the crucial question. Defendants cannot seriously claim at this stage, if ever, that the allegations in the indictment do not spell out a crime under the statute, i.e., that they could not be factually guilty of non-identification by virtue of false identification, nor do they ever concede that their own alleged behavior is unprotected by the Constitution. What they do attempt, however, is tp escape an assessment of the constitutional validity of prohibiting their *957 alleged activity by virtue of some legal legerdemain. They simply neglect to discuss the First Amendment aspects of the conspiracy alleged in the indictment. Then, while we are urged to keep our eyes on the statutory pea, they deftly switch the shells marked ‘ ‘ unconstitutional as applied ’ ’ and£ £ over-broad ’ ’ and argue the overall impact of the statute.
This court, however, is not taken in. The gravamen of the allegations in this case is that defendants affirmatively misrepresented the sponsorship of campaign literature as emanating from Liberal Party rather than Republican sources. Calculated falsehood is never protected by the First Amendment. (Time, Inc. v. Hill, 385 U. S. 374, 389-390.) There can be little doubt that a narrowly drawn statute could, constitutionally, prohibit the affirmative misrepresentation of the source of campaign literature and the misuse of the name of a political party or candidate in the attribution of such material. Although New York has no law directly prohibiting this type of activity, the prior restraint of injunctive relief has long been available in this State to prevent it. (Fay v. O’Connor, 169 Misc. 466, affd. 257 App. Div. 815, affd. 281 N. Y. 849; Mele v. Ryder, 8 A D 2d 390; see, generally, 2 Classman, Election Law [2d ed.], § 108.) Moreover, the compelling State interest that would underly such a statute has never been more obvious than in the present climate, as we become nationally aware of the existence and impact of political “ dirty tricks ” and forgeries that may have materially altered the outcome of no less a contest than one for the Democratic nomination for the Presidency of the United States. It is hardly coincidental, therefore, to note at this stage that one Federal court has recently held a Federal statute similar to section 457 (U. S. Code, tit. 18, § 612)[7] to be *958 constitutional in the case of the now-infamous individual charged with causing the mailing of a letter printed on “ Citizens for Muslrie ” stationery pertaining to Senators Jackson and Humphrey in the Florida Democratic Presidential Primary of 1972.[8] (UnitedStates v. Segr&tti, Case No. 73-153-Cr. T-K and 73-66-Cr. T-K [M. D. Fla., Tampa Div. decided July 26,1973].) The first of the two battles, therefore, must be decided against the defendants.
Turning to the contention that section 457 of the Election Law is unconstitutionally overbroad, it is apparent that the decision herein involves a more delicate 'balancing of interests. On the one hand is the impact of section 457 on free expression. On the other is the exigency of the interest claimed to underlie this statute as viewed through the statute’s narrow focus thereon.
The impact of the loss of anonymity in free expression is clear. Anonymity has been, historically, the medium of dissidents, shielding them from the retaliatory power of the establishment and, whether their fears of reprisal were justified or not, encouraging them to express unpopular views. Anonymous writings have an honored place in our political heritage. Their importance to the establishment of our democracy was recounted by the Supreme Court (per Black, J.) in Talley v. California (362 U. S. 60, 64-65): ‘ ‘ Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. The old seditious libel cases in England show the lengths to which government had to go to find out who was responsible *959 for books that were obnoxious to the rulers. John Lilburne was whipped, pilloried and fined for refusing to answer questions designed to get evidence to convict him or someone else for the secret distribution of books in England. Two Puritan Ministers, John Penry and John TJdal, were sentenced to death on charges that they were responsible for writing, printing or publishing books. Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. Along about that time the Letters of Junius were written and the identity of their author is unknown to this day. Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes.”
In a series of significant constitutional decisions, the chilling impact of the loss of anonymity on First Amendment freedoms was clearly recognized, and resulted in the striking down of various identification requirements. In Thomas v. Collins (323 U. S. 516), the Supreme Court invalidated a statute requiring union organizers to register and carry identity cards and to exhibit them on request. Said the court (p. 540): “ If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them * * *. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause.”
In United States v. Rumely (345 U. S. 41) the court sustained the reversal of the contempt conviction of a person who refused to provide a Congressional Committee with the names of persons who had purchased political literature from his group, the Committee for Constitutional Government. The court noted (p. 46) that “ the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals * * * raises doubts of constitutionality in view of the prohibition of the First Amendment ”, held the congressional subpoena invalid under a strict construction of the committee’s enabling legislation. Mr. Justice Douglas in a concurring opinion joined by Mr. Justice Black, stated (atp. 57): “ A requirement that a publisher disclose the identity *960 of those who buy his books, pamphlets, or papers is indeed the beginning of surveillance of the press. True, no legal sanction is involved here. Congress has imposed no tax, established no board of censors, instituted no licensing system. But the potential restraint is equally severe. ’ ’
In N.A.A.C.P. v. Alabama (357 U. S. 449, 462) and Bates v. Little Rock (361 U. S. 516) the court held that civil rights organizations had the right to withhold the names of their members and contributors, with the court stating in N.A.A.C.P.: “It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective * * * restraint on freedom of association
* * * Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.” (Also, see, Louisiana ex rel. Gremillion v. N.A.A.C.P., 366 U. S. 293.) More significantly, in Talley v. California (362 U. S. 60, supra) the court ruled unconstitutional “ on its face ” a Los Angeles ordinance prohibiting the anonymous distribution of ‘£ any handbill in any place under any circumstances ” (pp. 60-61). Said the court (pp. 64-65): “There can be no doubt that such an identification requirement would tend to .restrict freedom to distribute information and thereby freedom of expression * * * We have recently had occasion to hold in two cases that there are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified. (Bates v. Little Bock, 361 U. S. 516; N.A.A.C.P. v. Alabama, 357 U. S. 449, 462.) The reason for these holdings' was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance. This broad Los Angeles ordinance is subject to the same infirmity.”
Following Talley, in People v. Mishkin (17 A D 2d 243, affd. 15 N Y 2d 671), the courts of Mew York had the occasion to consider subdivision 2 of section 330 of the General Business Law, which had provided that every publication other than newspapers and magazines should ‘ ‘ conspicuously have imprinted * * * the true name and address of the publisher or printer.” The court, in a brief memorandum, struck down the provisions as unconstitutional relying on Talley.
Another Mew York decision .was Matter of Figari v. New York Tel. Co. (32 A D 2d 434), where the court held “ unconstitutional per se ” a telephone company regulation requiring subscribers who disseminated recorded messages to incoming callers to *961 state their name and address on the recording. The regulation was challenged by a group known as ‘ ‘ Let Freedom Ring ’ ’, whose mission was to play anti-Communist messages over the telephone. The court stated (p. 442) that “anonymity may •be necessary to preserve ” First Amendment freedoms, and that (p. 448) “it is self-evident that, for society to choose wisely among the best views, all ideas must be made available without restriction ”.
Potentially the most .significant of all these decisions was Zwickler v. Koota (290 F. Supp. 244), where a special three-Judge court ruled an identical predecessor to the statute under attack in the instant case unconstitutionally overbroad. The decision was later reversed as moot, however, by the ¡Supreme Court (sub nom. Golden v. Zwickler, 394 U. S. 103) which did not reach the constitutional issue, so that the District Court’s decision is not ¡binding authority. Zwickler had been convicted in Kings County of violating section 781-b of the Penal Law, later recodified without change in section 457 of the Election Law (L. 1965, ch. 1031, § 43, eff. Sept. 1, 1967), for distributing anonymous handbills “no more than mildly critical” of a speech delivered on the floor of the House of Representatives by a Congressman .standing for re-election. This conviction was then reversed by the Appellate Term on the grounds that the People failed to establish distribution of anonymous literature ‘ ‘ in quantity ’ ’, with that tribunal not .reaching the constitutional issue (290 F. Supp. 244, 246, n. 4). The reversal was affirmed (without opn.) by the New York Court of Appeals (People v. Zwickler, 16 N Y 2d 1069). The Congressman, in the meantime, had become a Judge. Nevertheless, Zwickler invoked the jurisdiction of the Federal District Court seeking a declaration that section 781-b of the Penal Law was unconstitutional. The court held that Zwickler’s action was not mooted by the retirement of the Congressman to more respectable pursuits, and held that the statute was unconstitutionally overbroad.
Nevertheless, the District Attorney’s contention, which impliedly concedes the importance of anonymity to freedom of expression, is that there is no absolute right to communicate anonymously when there abides an overriding public interest which calls for identification. Thus, cite the People, a reporter must identify the source of a published news story before a grand jury (Branzburg v. Hayes, 408 U. S. 665) and a person must identify himself in order to obtain a license to lobby before Congress (United States v. Harriss, 347 U. S. 612), *962 hold a meeting in a public park (Poulos v. New Hampshire, 345 U. S. 395), solicit for money door to door (Cantwell v. Connecticut, 310 U. S. 296) and make use of second class mail (Lewis Pub. Co. v. Morgan, 229 U. S. 288).
As has already been stated, freedom of speech is not an unfetr tered right, so the contention that there is no absolute right to anonymity must certainly be a correct one. But the People’s claim and the circumstances in this case must be placed in their proper First Amendment perspective. All but one of the precedents cited by the District Attorney involves licensing, which indirectly curtails full anonymity but does not necessarily prevent individual anonymous statements. Full-blown identification requirements, however, by their existence are designed to prevent all anonymous utterances within their ambit (see Zwickler v. Koota, 290 F. Supp. 244, 254, n. 15; cf. Thomas v. Collins, 323 U. S. 516, supra; Matter of Figari v. New York Tel. Co., 32 A D 2d 434, 444, supra). Also, all of the above citations, save Branzburg, concern the regulation of " speech plus ”. (Harriss, it should be noted, specifically dealt with the registration of paid professional lobbyists who have direct contact with Congressmen.) The only Supreme Court precedent for limiting anonymity, therefore, which does not involve the licensing of conduct is Branzburg, .which is not an identification requirement but at most a limited incursion on freedom of the press in favor of the principle that the State has the right to every man’s .evidence within the secret and limited confines of a grand jury investigating criminal conduct. Unlike those cases, this statute is an absolute identification requirement designed to regulate pure speech involving political affairs at the fateful hour of the political process, that of an election for public office.
Attempting to use the political nature of the speech herein involved to his advantage, however, the District Attorney argues that the need for integrity in contests for public office is a concernment which outweighs the right to anonymity where campaign literature is concerned. 'Section 457, it is claimed, furthers fair and honest election campaigns because the requirement of identification deters defamatory personal and ethnic attacks on candidates and, in addition, also fosters the enforcement of various Federal and State requirements regulating campaign contributions and expenditures.[9]
*963 But the statute in question here is not limited to deterring defamation or personal attacks, nor is it limited to campaign literature sponsored by candidates or political parties.
Perhaps a statute strictly limited to the activities of campaign organizations would survive First Amendment scrutiny, justified by the same interests that spawned the contribution .and expenditure laws, if it did not otherwise infringe on First Amendment rights. (See American Civ. Liberties Union v. Jennings, 366 F. Supp. 1041; 42 U.S.L.W. 2261.) But that is not the provision before this court.
Perhaps a statute strictly limited to preventing ethnic, racial or religious slurs in an election campaign would be consistent with freedom of expression, justified by the clear interest in preventing the polarization of our society and maintaining, at the very least, a modicum of decency in political campaigns. But that is not the statute before this court.
Perhaps a statute strictly limited to attacks on the purely personal character of a candidate would pass constitutional muster, although that is a much more doubtful proposition inasmuch as the difficulty in distinguishing between the personal and political attributes of a candidate might deter the free and uninhibited exchange of views guaranteed under New York Times Co. v. Sullivan (403 U. S. 713, supra). (But, see, Canon v. Justice Ct., 61 Cal. 2d 446.)[10] Again, however, that is not the provision before this court.
It is noteworthy that arguments strikingly similar to the instant claim of the dual purposes of section 457 were raised and rejected in several of the cases cited above which recognized, the impact of the loss of anonymity on free speech. In Talley v. California (362 U. S. 60, 64, supra) the court noted: “ Counsel has urged that this ordinance is aimed at providing a way to identify those responsible for fraud, false advertising and libel. Yet the ordinance is in no manner so limited, nor have *964 we been referred to any legislative history indicating such a purpose.” In People v. Mishkin (17 A D 2d 243, 244, supra) the court stated: “ The District Attorney suggests that the statute may ibe found constitutional if its application is limited to obscene publications for there would be a purpose in facilitating the discovery of the publisher. But the statute itself is not so limited, and there is nothing to indicate that this was the legislative purpose. We do not reach the question whether such a purpose would validate the statute.”[11] Matter of Figari v. New York Tel. Co. (32 A D 2d 434, 448, supra) the court rejected the argument therein raised that identification would deter defamatory messages: ‘ ‘ On a balancing of interests, democratic government is best served when citizens may freely speak out on questions of public concern, even if thereby some individual or organization be wrongfully caluminated ’ In Zwickler v. Koota (290 F. Supp. 244, 253-254, supra) the court stated: ‘' Nor does it avail defendant to urge upon us that § 781-b ‘ protects .the integrity of the electoral process * * * by facilitating the enforcement of various anti-corruption provisions in the Election Law’ * * * A constitutional right •of those privileged to speak with anonymity -unbreached, however, may not be disregarded to facilitate the prosecution of others who by their offending may have forfeited that right. The current attitude of the Courts is to place emphasis on the protection and preservation of the freedom of .the many to advocate conduct or to reprehend misconduct in public affairs, not to redress the wrongs, real or fancied, of the individual office holder or aspirant for what is uttered concerning his past or prospective management of those affairs * * * The more efficient administration of the ancillary procedures which *965 concern the Attorney General must give room to the ‘ profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials. ’ [Citing New York Times Co. v. Sullivan, 376 U. S. 254, 270, supra.] ”[12]
I conclude, therefore, that even granting that the compelling nature of the concern for “ the integrity of political campaigns ” is sufficient to permit some limitations on totally free expression, this statute is not narrowly enough drawn to further the State’s legitimate interest. It is in no way limited to deterring campaign defamation and financing violations. It makes anonymity a crime when anyone (candidate, political organization, private organization or private individual) prints or distributes any literature “ in quantity” (poster, handbill or letter) containing any statement (reckless, responsible, political, personal, true, false, favorable, unfavorable, scurrilous or discreet) concerning any candidate (declared or undeclared) or issue on the ballot (constitutional amendment or proposition) “ in connection with ’ ’ any party or governmental election.
It thereby prohibits, for example, a congregant from anonymously distributing leaflets on behalf of an amendment to the State Constitution which is against the wishes of his religious sect. It prevents a group of workers from anonymously publicizing a candidate or ballot proposition unacceptable to their employer. It prevents a government contractor from anonymously criticizing the performance of its incumbent benefactor. In short, it prevents anyone from anonymously propagandizing on behalf of candidates or ballot issues that the powers-that-be dislike. It deters anyone who fears retribution, whether his anxieties are justified or not, from freely expressing his positions on political matters at the crucial time of an election. Its subtle message is to conform. Toe the party line. Publicly identify yourself if you disagree. Let everyone know who you are. Otherwise be silent and abide with the status quo.
*966 "What exigent interest compels restrictions on a private individual simply handing out flyers on a street corner criticizing the performance of a candidate seeking re-election? What overriding need is there for a regulation inhibiting a group of citizens from communicating its views on the merits of a constitutional amendment or a sewer bond issue?
The District Attorney suggests that anonymity is no longer necessary, relevant or beneficial to the political process. Fear of reprisals is largely illusory now, the prosecutor claims, and anonymity is most often the vehicle of the irresponsible. Moreover, it is argued, ideas are best evaluated when their source is known.
Then was Junius the last patriot when he wrote, anonymously, that we “ detest the pagentry of a king, and the supercilious hypocrisy of a bishop ” (Letters, No. 35, Dec. 19, 1769) ? People are rarely beheaded nowadays, but was the regime of George III the last tyrannical establishment?
Of course, the identity of the source is helpful in evaluating ideas. But “ the best test of truth is the power of the thought to get itself accepted in the competition of the market ” (Abrams v. United States, 250 U. S. 616, 630 [Holmes, J.]). Do not underestimate the common man. People are intelligent enough to evaluate the source of an anonymous writing. They can see it is anonymous. They know it is anonymous. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is “ responsible ”, what is valuable, and what is truth.
For the foregoing reasons, it is apparent that, assuming these defendants have the standing to raise the overbreadth issue, section 457 of the Election Law of the ¡State of New York must be declared unconstitutional as overly broad in that it unfairly and unnecessarily sweeps within its criminal sanctions activity that is the protected right of every citizen under the First Amendment.
The only question that remains to be decided, then, is whether these defendants have the standing to raise the overbreadth issue and thereby bring about the striking down of this statute, even though this court has decided that the defendants’ own alleged misrepresentation is not protected by the First Amendment.
Under Dombrowski v. Pfister (380 U. S. 479, supra), Broadrick v. Oklahoma (413 U. S. 601, supra) and Plummer v. City of *967 Columbus (414 U. S. 2) the answer must be that they do. Under Broadrick, the overbreadth standing doctrine should only be upset when the statute under attack is aimed at regulating primarily conduct, not speech. When the provision seeks to regulate “ only pure speech” or the “ time, place and manner of expressive or communicative conduct ’ ’, a litigant is permitted to challenge a statute “ not because [his] own rights have been violated ” but “ because * * * the statute’s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.” (413 U. S. 601, 612-613.)
Section 457 is clearly aimed at regulating “ pure speech”, as the distribution of literature is clearly considered to be (Lovell v. Griffin, 303 U. S. 444; see Talley v. California, 362 U. S. 60, 64 supra), and the manner of expression. Indeed the District Attorney so concedes.[13] ‘' Liberty of circulating is as essential to [freedom of expression] as liberty of publishing ; indeed, without the circulation, the publication would be of little value.” (Lovell v. Griffin, supra, p. 452.)
The defendants, therefore, have standing. Section 457 of the Election Law of the State of New York is declared unconstitutional by virtue of its overbreadth.
The motion to dismiss the indictment is granted.
For the foregoing reasons, the court finds it unnecessary to reach defendants ’ claim that section 457 is so vague and indefinite as to deprive them of due process of law under the Fourteenth Amendment of the United States Constitution and section 6 of article I of the Constitution of the State of New York. (See, *968 e.g., Rabe v. Washington, 405 U. S. 313, 315; Lanzetta v. New Jersey, 306 U. S. 451; Connally v. General Constr. Co., 269 U. S. 385. Also, see, People v. Scott, 26 N Y 2d 286.)

. The invalidity of a statute defining an object crime destroys the legal basis upon which a charge of conspiring to commit it rests, requiring dismissal of both the substantive and conspiracy counts in an indictment. (See, e.g., People v. Levy, 283 App. Div. 383; People v. Rockwell, 275 App. Div. 568, affd. 300 N. Y. 557.)

. Added by L. 1965, eh. 1031, § 43, eff. Sept. 1, 1967. Formerly Penal Law of 1909, § 781-b (added by L. 1941, ch. 198, amd. by L. 1957, eh. 717, L. 1962, eh. 576; repealed by Penal Law of 1965, § 500.05, eff. Sept. 1,1967).

. Reply Memorandum of Defendant Duryea, p. 20. It should be noted at this juncture that all the defendants joined in the briefs and arguments of their codefendants, with counsel for the defendant Duryea playing, clearly, a principal role.

. Id.

. Memorandum of defendant Duryea, p. S.

. This statute provides as follows:
“ Publication or distribution of political statements. Whoever willfully publishes or distributes or causes to be published or distributed, or for the purpose of publishing or distributing the same, knowingly deposits for mailing or delivery or causes to be deposited for mailing or delivery, or, except in cases of employees of the Postal Service in the official discharge of their duties, knowingly transports or causes to be transported in interstate commerce any card, pamphlet, circular, poster, dodger, advertisement, writing or other statement relating to or concerning any person who has publicly declared his intention to seek the office of President, or Vice President of the United States, or Senator or Representative in, or Delegate or Resident Commissioner to Congress, in a primary, general, or special election, or convention of a political party, or has caused or permitted his intention to do so to be publicly declared, which does not contain the names of the persons, associations, committees, or corporations responsible for the publication or distribution of the same, and the names of the officers of each such association, committee, or corporation, shall be fined *958 not more than $1,000 or imprisoned not more than one year, or both.” (As amd. Aug. 12, 1970, by Pub. L. 91-375, § 6, subd. [j], par [7], 84 TJ. S. Stat. 777.)
It should be noted that this statute has many similarities to the statute under consideration herein. It also has some notable differences, in that it applies only to/ declared candidates and omits references to ballot propositions or amendments. The constitutionality of section 612 has been upheld, at the District Court level. (United States v. Segretti, infra, without opn.; United States v. Insco, 365 F. Supp. 1308; United States v. Scott, 195 F. Supp. 440 [D. N. Dak., 1961].)

. N. Y. Times, Oct. 2,1973, p. 1, col. 3.

. Those cited by the District Attorney in his Memorandum (pp. 19-22) are the following: Federal Corrupt Practices Act of 1925 (U. S. Code, tit. 2, §§ 241-252); Federal Election Campaign Act of 1971 (U. S. Code, tit. 2, |§ 431-454). Election Law (§§ 320-325, 454, 455, 460).

. The statute involved in Canon, section 12047 of the California Elections Code required identification of the sponsor to appear on any literature “ designed to injure or defeat any candidate for nomination or election to any public office by reflecting upon his personal character or political action The court, which voided the statute as “ discriminatory ” in that under its terms the sponsor was required to be a California voter, indicated in dictum (p. 452) that the statute applied only to “ attacks on candidates ” and that the phrase “ political action ” would have to be construed as “ including only attacks which reflect on the personal character of the candidate.” “More importantly ”, noted the court, “ the section applies only to attacks on candidates, not to writings which are a communication on views about issues.” It should also be noted herein that statutes limited to personal attacks were upheld in Commonwealth v. Evans (156 Pa. Super. Ct. 321) and in State v. Freeman (143 Kan. 315).

. 'Similarly, there is nothing before this court to indicate the legislative purpose behind section 457. The District Attorney has made part of the record here a report of an investigation by a Special Deputy Attorney-General of campaign abuses involving the violation of financial reporting requirements in the New York City mayoralty election of 1961. This report, the People claim, “led to [the] adoption of Section 457” (Memorandum, p. 22). There is no evidence, however, to indicate any nexus between this report and section 457. Moreover, an examination of the legislative history of this statute recounted by the court in Zwickler v. Koota, (supra) indicates the effective date of the statute’s predecessor, section 781-b, of the Penal Law was September 1, 1941, and that the basic statute has survived with minor amendments until the present. Even if a legislative purpose to promote the enforcement of disclosure requirements could be evinced, such purpose would indicate an interest no more exigent than that which the disclosure requirements themselves bespeak and would not justify sweeping incursions on First Amendment rights. (See American Civ. Liberties Union v. Jennings, 366 F. Supp. 1041, supra; cf. Mills v. Alabama, 384 U. S. 214, 220.)

. Cf. American Civ. Liberties Union v. Jennings (supra), where the court rejected the argument that the enforcement of subdivision (b) of section 104 of title I (86 U. S. Stat. 6) of the Federal Election Campaign Act of 1971 was permissible justification for what the court considered a “prior restraint” on freedom of the press. Subdivision (b) of section 104 requires newspapers to obtain a certification from the sponsor of any political advertisement that spending limits were not thereby being exceeded. Said the court, “ This fact that restrictions have been imposed in furtherance of matters of a legitimate governmental concern is neither dispositive nor, in this instance, persuasive.” (42 U.S.L.W. at p. 2261.)

. The following colloquy took place upon the oral argument of this motion on J anuary 15, 1974:
the court: Let me ask you three questions: You concede, do you not, that it’s hard to defend the other provisions of the statute dealing with, for example, constitutional amendments and propositions?
mr. juviler. Yes.
the court : Do you further concede contrary to the Broadrick case that this is a pure speech case, do you not?
mr. juviler: Yes.
the court : Do you also agree that Dombrowski against Pfister is the law of the land?
MR. JUVILER: Yes.
the court : Where do we go from there ?
MR. juviler : I don’t know. * * *