(No. 62926.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MARGARET WHITE, Appellee.

*Opinion filed February 20, 1987.*

172

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Jill Wine-Banks, Mark L. Rotert, Nathan P. Maddox, and Judith H. Schlessinger, Assistant Attorneys General, of counsel), for the People.

David B. Johnson, of Sidley & Austin, and Harvey Grossman and Barbara P. O'Toole, all of Chicago, for appellee.

JUSTICE SIMON delivered the opinion of the court:

Prior to the November 1984 election for the office of State's Attorney of White County, the defendant, Margaret White, allegedly distributed a leaflet urging voters not to support the incumbent, Thomas Sutton, and to instead write in the name of James R. Conley, Jr. The leaflet stated:

HOW TO WRITE IN A VOTE
WRITE OFFICE,
☐ MAKE SQUARE,
PUT AN X IN SQUARE.
LETS GET SUTTON OUT OF OFFICE.
IT SHOULD LOOK LIKE THIS—
CLIP—TAKE TO POLLS

---

STATES ATTORNEY
☒ JAMES R. CONLEY, JR.

For distributing this leaflet without printing the name and address of the persons publishing and distributing it on the leaflet, the defendant was charged by information with violating section 29—14 of the Election Code (Ill. Rev. Stat. 1983, ch. 46, par. 29—14). The circuit court of White County dismissed the charge on the ground that section 29—14 is unconstitutional under both the first amendment to the United States Constitution and article I, section 4, of the 1970 Illinois Constitution. The State's direct appeal to this court was allowed as a matter of right (87 Ill. 2d R. 603).

Section 29—14 provides:

"Publication of political literature. Any person or group of persons, or any committee, firm, organization, association, league or other body publishing, circulating, or distributing any pamphlet, circular, handbill, advertisement or other political literature soliciting votes for or against any candidate for nomination or election to, or retention in, any public office or soliciting votes in support of or in opposition to any public question to be submitted for the ballot at an election which does not have printed thereon in plain type the name and address of the person or persons, or the names and business address of the committee, firm, organization, association, league or other body causing such matter to be published and distributed, the name of its chairman, director, manager or principal officer, as the case may be, and the name of its treasurer if a different person, shall be guilty of a Class

A misdemeanor. If a political committee as defined in Article 9 has already filed its statement of organization with the State Board of Elections or with the county clerk, as the case may be, or is registered with the Federal Election Commission, it shall not be necessary to print the name of its chairman or its treasurer, or its address on political literature which it causes to be published and distributed, and the name of the political committee printed on the literature shall be sufficient. However this Section shall not apply to palm cards, tickets, premiums or similar campaign items which because of size or shape are not adaptable to printing of attribution of source thereon. Nothing in this Section shall be construed to apply to any matter published in any newspaper, magazine or journal recognized and circulating as such, which matter is published by such newspaper, magazine or journal on its own behalf and upon its own responsibility and for which it shall not charge or receive any compensation whatsoever, nor shall it apply to any publication issued by any legally constituted election official in the performance of his duties.

The attribution of source required by this Section shall be in addition to the notice required on political literature soliciting funds as prescribed by Section 9—9 of this Code." Ill. Rev. Stat. 1983, ch. 46, par. 29—14.

In striking down this statute, the circuit judge relied on the United States Supreme Court's decision in *Talley v. California* (1960), 362 U.S. 60, 4 L. Ed. 2d 559, 80 S. Ct. 536, and several State court cases following *Talley*. The defendant in *Talley* was convicted of violating an ordinance prohibiting the distribution of any handbill unless the name and address of the printer and distributor appeared on the face of the handbill. The Supreme Court, emphasizing both the historical and practical importance of anonymous political speech, held the ordinance unconstitutional on its face. Although the State had argued that the ordinance was intended to identify those responsible for fraud, false advertising and libel,

the court noted that it was not so limited and reserved judgment on the validity of a law "limited to prevent these or any other supposed evils." 362 U.S. 60, 64, 4 L. Ed. 2d 559, 562, 80 S. Ct. 536, 538.

The statute at issue in this case does not prohibit the anonymous distribution of all handbills and leaflets, but only "political literature soliciting votes for or against any candidate for nomination [,] election *** or retention *** [or] in support of or in opposition to any public question to be submitted for the ballot at an election." The question is whether this more restricted range of operation for the ban on anonymous speech is sufficient to avoid the constitutional infirmity of the ordinance in *Talley*.

In assessing the validity of a restriction on first amendment rights, the court must evaluate the "character and magnitude of the asserted injury" to the individual's rights, the strength and legitimacy of the "precise interests put forward by the State as justifications," and "the extent to which those interests make it necessary to burden" the individual's rights. (*Anderson v. Celebrezze* (1983), 460 U.S. 780, 789, 75 L. Ed. 2d 547, 558, 103 S. Ct. 1564, 1570.) Significant encroachments on first amendment rights must survive "exacting scrutiny." (*Buckley v. Valeo* (1976), 424 U.S. 1, 64, 46 L. Ed. 2d 659, 713, 96 S. Ct. 612, 656.) This means that the statute must further a "compelling" State interest (*Brown v. Hartlage* (1982), 456 U.S. 45, 53-54, 71 L. Ed. 2d 732, 741, 102 S. Ct. 1523, 1528-29; *NAACP v. Alabama* (1958), 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163; *Commonwealth v. Dennis* (1975), 368 Mass. 92, 329 N.E.2d 706; *State v. Fulton* (La. 1976), 337 So. 2d 866), and the State " 'may not choose means that unnecessarily restrict constitutionally protected liberty'." (*Anderson v. Celebrezze* (1983), 460 U.S. 780, 806, 75 L. Ed. 2d 547, 568, 103 S. Ct. 1564, 1579). As the Supreme Court has stated:

" ' "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." [Citation.] If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.' [Citation.]" 460 U.S. 780, 806, 75 L. Ed. 2d 547, 568, 103 S. Ct. 1564, 1579.

I

The State maintains that because the prohibition on anonymous literature soliciting votes for or against candidates or public questions does not by its terms prohibit any speech, but only requires the speaker to own up his views, the statute places only a "negligible restraint" on free expression. The reason this position fails is that it is precisely the one the Supreme Court rejected in *Talley.* "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." (*Talley v. California* (1960), 362 U.S. 60, 64, 4 L. Ed. 2d 559, 563, 80 S. Ct. 536, 538.) Although the ordinance at issue in *Talley* was not limited to banning anonymous political expression, the court specifically relied on the historical importance of such expression in striking it down:

> "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." (362 U.S. 60, 64, 4 L. Ed. 2d 559, 563, 80 S. Ct. 536, 538.)

Anonymous political literature was a key weapon in the arsenal of colonial patriots, and "[e]ven the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names." 362 U.S. 60, 65, 4 L. Ed. 2d 559, 563, 80 S. Ct. 536, 539.

The effect of broadly compelling disclosure of the identities of persons expressing political views is "unconstitutional intimidation of the free exercise of the right to advocate" (*NAACP v. Alabama* (1958), 357 U.S. 449, 461, 2 L. Ed. 2d 1488, 1499, 78 S. Ct. 1163, 1171). Persons harboring dissenting or unpopular political views, or even those merely advocating a quixotic write-in campaign, may risk economic reprisal, loss of employment, or other "manifestations of public hostility" (*NAACP v. Alabama* (1958), 357 U.S. 449, 462, 2 L. Ed. 2d 1488, 1500, 78 S. Ct. 1163, 1172) if required to identify themselves. "[F]ear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Talley v. California* (1960), 362 U.S. 60, 65, 4 L. Ed. 2d 559, 563, 80 S. Ct. 536, 539.

By requiring identification of the speaker, section 29—14 plainly imposes a substantial restriction on the right to express political views. Under this statute even pure political advocacy, such as urging the public to "vote for Smith," is banned unless the author is identified. The State apparently regards the impairment as a minor one because it applies only to certain political literature, not to anonymous literature in general. This argument, though, overlooks the rationale for striking down the broader law in *Talley*, which was the importance of anonymous *political* speech. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." (*Garrison v. Louisiana* (1964), 379 U.S. 64, 74-75, 13 L. Ed. 2d 125, 133, 85 S. Ct. 209, 216.) In attempting to regulate political speech, this statute touches the core of first amendment values. (*Brown v. Hartlage* (1982), 456 U.S. 45, 52, 71 L. Ed. 2d 732, 740, 102 S. Ct. 1523, 1528.) The concerns expressed by the Supreme Court in *Talley* cannot be avoided by the expedient of banning only the most important type of anonymous speech and leaving untouched other forms of

expression less central to the purposes of the first amendment. See *State v. North Dakota Education Association* (N.D. 1978), 262 N.W.2d 731, 735.

The State also attempts to minimize the impact of this statute on first amendment values by pointing out that not all anonymous political discourse is criminalized, but only anonymous literature that seeks to influence votes on electoral races or public questions. The State's view again appears to be that the more central the expression is to the right of self-government, the less the injury to first amendment values in restricting it. This proposition lacks validity, for " 'if it be conceded that the First Amendment was "fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people," then it can hardly be doubted that *the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.*' " (Emphasis added.) (*Brown v. Hartlage* (1982), 456 U.S. 45, 53, 71 L. Ed. 2d 732, 741, 102 S. Ct. 1523, 1529, quoting *Monitor Patriot Co. v. Roy* (1971), 401 U.S. 265, 271-72, 28 L. Ed. 2d 35, 41, 91 S. Ct. 621, 625.) The fact that this statute affords protection to anonymous abstract philosophical discussion but bars anonymous campaign literature does not render the encroachment on first amendment rights negligible. Notably, the Federalist Papers, which were published under a pseudonym, were written not as political philosophy, but to support the ratification of the Constitution (*Talley v. California* (1960), 362 U.S. 60, 4 L. Ed. 2d 559, 80 S. Ct. 536).

## II

The State asserts that whatever the burden on first amendment rights, section 29—14 is justified by the compelling State interest in preserving the "integrity of the electoral process." This term does not, however, have

any talismanic significance, and its bare invocation cannot serve to uphold the statute. Rather, we must carefully scrutinize the "precise interests" (*Anderson v. Celebrezze* (1983), 460 U.S. 780, 789, 75 L. Ed. 2d 547, 558, 103 S. Ct. 1564, 1570) said to be advanced by the statute.

The State first submits that the statute is justified by its interest in an informed electorate. The State argues that a political communication can only be properly evaluated and the public fully informed if the name of the speaker is revealed. Obviously, the identity of the source may be helpful in assessing the veracity of an assertion or the validity of an opinion; but "the best test of truth is the power of the thought to get itself accepted in the competition of the market" (*Abrams v. United States* (1919), 250 U.S. 616, 630, 63 L. Ed. 1173, 1180, 40 S. Ct. 17, 22 (Holmes, J., dissenting); *People v. Duryea* (1974), 76 Misc. 2d 948, 351 N.Y.S.2d 978, *aff'd* (1974), 44 A.D.2d 663, 354 N.Y.S.2d 129). Voters are not sheep, and it is implausible to suppose that they will ignore the circumstance of anonymity in evaluating the message. In our opinion, the voters of this State are perfectly capable of assessing the merits of a viewpoint even though the person expressing it does not reveal his identity. We would point out that much of our news concerning national affairs comes from sources which remain unidentified. "The State's fear that voters might make an ill-advised choice does not provide the State with a compelling justification for limiting speech." *Brown v. Hartlage* (1982), 456 U.S. 45, 60, 71 L. Ed. 2d 732, 745, 102 S. Ct. 1523, 1532.

In any event, the statute is not well tailored to serve the goal of an informed electorate. By banning anonymity, the law deters many from expressing their opinions at all, resulting in an overall decrease in the flow of information to the public. Far from creating a more in-

formed electorate, the statute extinguishes sources of information. "A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Anderson v. Celebrezze* (1983), 460 U.S. 780, 798, 75 L. Ed. 2d 547, 564, 103 S. Ct. 1564, 1575.

Implicit in the State's "informed electorate" justification is the concern that the public could be misinformed and an election swayed on the strength of an eleventh-hour anonymous smear campaign to which the candidate could not meaningfully respond. The statute cannot be upheld on this ground, however, because it sweeps within its net a great deal of anonymous speech completely unrelated to this concern. In the first place, the statute has no time limit and applies to literature circulated two months prior to an election as well as that distributed two days before. The statute also prohibits anonymous literature supporting or opposing not only candidates, but also referenda. A public question clearly cannot be the victim of character assassination. Although the leaflet in this case did not concern a public question, the defendant is entitled to assert the unconstitutionality of that regulation of "pure speech" as well as the portion of the provision which applies to her alleged conduct. *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 615, 37 L. Ed. 2d 830, 842, 93 S. Ct. 2908, 2917.

More fundamentally, the law is too broad in that it criminalizes not only false and malicious statements concerning candidates, but also true ones, and even anonymous literature which is "wholly laudatory" (*Commonwealth v. Dennis* (1975), 368 Mass. 92, 97, 329 N.E.2d 706, 709) of a candidate. The present case illustrates one of the menaces of the statute: the leaflets allegedly distributed by the defendant did not attack the character of the incumbent, but simply urged his defeat in the elec-

tion. This is pure political advocacy. The statute unnecessarily restricts protected expression and thus cannot be considered the least drastic alternative for preventing or remedying character assassination. "Anyone who has been victimized by anonymous smears will understand the motives of the sponsors. But constitutional imperatives must prevail and our hopes must lie in the good sense and decency of the electorate, or in the passage of a more carefully drawn statute designed to meet the specific evil." *State v. North Dakota Education Association* (N.D. 1978), 262 N.W.2d 731, 736.

The State next contends that the statute is necessary to prevent the public from falsely attributing anonymous literature to the wrong persons or organizations. As an example, the State suggests that some people might have thought the leaflet in this case was circulated by Mr. Conley, the person supported as a write-in candidate in the leaflet, even though Mr. Conley apparently was not a candidate and was not behind the leafleting effort.

We do not believe that there was a significant risk of false attribution in this case. Campaigns to draft a candidate are a frequent occurrence in our political life, and there is no reason to think the public would believe, simply because the leaflet advocated replacing the incumbent State's Attorney with Mr. Conley, that the latter was actively seeking the office.

Of course, situations can easily be imagined in which there is a real risk that anonymous literature will falsely and intentionally create the impression that the literature has a source other than the true source. For example, an unscrupulous supporter of one candidate could distribute anonymous literature giving the impression that a politically unpopular organization endorsed his opponent. But this kind of chicanery, like a direct smear against a candidate, is certainly susceptible to more precise regulation than comprehensively banning anonymous

speech in election campaigns, concerning both candidates and public questions, whether or not it bears any risk of being incorrectly attributed to someone else. The State has an interest in preventing intentional deception of the voters, but that interest cannot be served by a statute that sweeps too broadly, and in doing so stifles speech which has little or no tendency to misinform, let alone ·deceive.

Finally, the State briefly refers to its interest in attracting qualified candidates for public office. It asserts that qualified persons are more likely to stand for election and expose themselves to criticism if they can be assured that they will know the identities of their critics and so be able to respond intelligently. While the State does have an interest in attracting qualified candidates, any connection between this statute and that interest is too tenuous. (See *Buckley v. Valeo* (1976), 424 U.S. 1, 64, 46 L. Ed. 2d 659, 713, 96 S. Ct. 612, 656 (there must be a "substantial relation" between the State's interest and the information required to be disclosed).) Politics is not for the frail or faint of heart. Candidates enter the political arena "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan* (1964), 376 U.S. 254, 270, 11 L. Ed. 2d 686, 701, 84 S. Ct. 710, 721.

Even if this statute were thought to advance a compelling interest in attracting candidates, it is still too broadly drawn to pass constitutional muster. It prohibits a great deal of innocent or favorable anonymous speech that, like the leaflet allegedly distributed by the defendant here, could not trouble the most timid potential can-

didate, and it restricts discussion of public questions as well as debate on candidates.

The State's position that any of its interests are sufficiently compelling to justify a substantial burden on free expression is undercut by the terms of the statute itself. Section 29—14 exempts from the identification requirement "palm cards, tickets, premiums or similar campaign items which because of size or shape are not adaptable to printing of attribution of source thereon." Under this exception, anonymous campaign statements are beyond the reach of the statute simply because the publisher is wily enough to print them on a small document, button, or unusually shaped item. If the State's interests were indeed compelling, would it permit the identification requirement to be so easily subverted? The exception also creates an anomaly: a vicious anonymous slur against a candidate contained on a palm card is permitted, but an unattributed statement of support on a handbill which is in no way defamatory is criminalized.

## III

"It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." (*Broadrick v. Oklahoma* (1973), 413 U.S. 601, 611-12, 37 L. Ed. 2d 830, 839-40, 93 S. Ct. 2908, 2915.) Section 29—14 chokes off the necessary breathing space. It does not advance any compelling State interest, and less restrictive alternatives are available to achieve the asserted State goals. We therefore conclude that there is no justification for the wholesale restriction on freedom of expression created by this statute. The statute is unconstitutional on its face.

Our conclusion here is in accord with persuasive authority from other courts considering similar statutes since *Talley*. (See *Printing Industries of the Gulf Coast v. Hill* (S.D. Tex. 1974), 382 F. Supp. 801, *vacated on other grounds* (1975), 422 U.S. 937, 45 L. Ed. 2d 664, 95 S. Ct. 2670; *Zwickler v. Koota* (E.D.N.Y. 1968), 290 F. Supp. 244, *rev'd on other grounds* (1969), 394 U.S. 103, 22 L. Ed. 2d 113, 89 S. Ct. 956; *Commonwealth v. Dennis* (1975), 368 Mass. 92, 329 N.E.2d 706; *State v. Fulton* (La. 1976), 337 So. 2d 866; *State v. North Dakota Education Association* (N.D. 1978), 262 N.W.2d 731; *Schuster v. Imperial County Municipal Court* (1980), 109 Cal. App. 3d 887, 167 Cal. Rptr. 447; *People v. Duryea* (1974), 76 Misc. 2d 948, 351 N.Y.S.2d 978, *aff'd* (1974), 44 A.D.2d 663, 354 N.Y.S.2d 129.) Brushing off these carefully reasoned decisions, the State relies upon two brief post-*Talley* decisions to the contrary. (See *Morefield v. Moore* (Ky. 1976), 540 S.W.2d 873; *State v. Acey* (Tenn. 1982), 633 S.W.2d 306.) Both of those cases involved statutes that did not reach anonymous comment on public questions and were consequently narrower than section 29—14 of the Election Code. More importantly, both also ignored the teachings of *Talley*. The decision in *Morefield* was premised on the court's belief that anonymity in the conduct of public elections was not only unnecessary, but "repulsive." (540 S.W.2d 873, 875.) *Acey* did not even mention the impact of the statute on first amendment rights, and concluded without analysis that there were no less restrictive means of furthering the State's interest.

Even further afield are the cases from three other States antedating *Talley*. (See *State v. Babst* (1922), 104 Ohio St. 167, 135 N.E. 525; *Commonwealth v. Evans* (1944), 156 Pa. Super. 321, 40 A.2d 137; *State v. Freeman* (1936), 143 Kan. 315, 55 P.2d 362.) None of these decisions recognized *any* right to anonymous speech; the

decisions in *Freeman* and *Babst* did not even recognize the applicability of the first amendment to the States. Moreover, the statutes involved in *Freeman* and *Evans* only prohibited anonymous writings designed to injure or defeat a candidate by attacking his character or record; those laws are obviously far more narrowly drawn than the statute here which outlaws anonymous advocacy of all sorts, even praise.

*Buckley v. Valeo* (1976), 424 U.S. 1, 46 L. Ed. 2d 659, 96 S. Ct. 612, and *United States v. Harriss* (1954), 347 U.S. 612, 98 L. Ed. 989, 74 S. Ct. 808, do not suggest that section 29—14 is constitutional. In *Buckley*, the Supreme Court upheld a Federal statute which, *inter alia*, required reporting and disclosure of the names of contributors to political campaigns. *Buckley* is distinguishable on two grounds. (See *State v. Fulton* (La. 1976), 337 So. 2d 866; *Schuster v. Imperial County Municipal Court* (1980), 109 Cal. App. 3d 887, 167 Cal. Rptr. 447.) First, contributing to a political campaign, unlike distributing political literature, is not an act of pure speech. (See *Buckley v. Valeo* (1976), 424 U.S. 1, 21, 46 L. Ed. 2d 659, 689, 96 S. Ct. 612, 636.) Second, the plaintiffs in *Buckley* conceded, and the court agreed, that the disclosure requirements appeared to be the least restrictive alternatives for achieving the State's compelling interests. *Buckley* specifically distinguished *Talley* on this basis. As we have said, section 29—14, like the *Talley* ordinance, is not a narrowly tailored means for achieving any such interests.

*Harriss*, which predated *Talley*, upheld a statute requiring registration of paid lobbyists who solicited or received contributions for the purpose of influencing legislation. That identification requirement applied to those seeking to affect the course of government not in open public debate, but in private discussions. Not only was the statute "restricted to its appropriate end" (*United*

*States v. Harriss* (1954), 347 U.S. 612, 626, 98 L. Ed. 989, 1001, 74 S. Ct. 808, 816), but that end was a compelling one—preventing special interest groups from drowning out the "voice of the people." (347 U.S. 612, 625, 98 L. Ed. 989, 1000, 74 S. Ct. 808, 816.) While *Buckley* and *Harriss* demonstrate that anonymity is not constitutionally required in all circumstances involving political issues, they do nothing to undercut the premise of *Talley* that the right to engage in political advocacy anonymously is an important one which can only be infringed upon by a statute carefully limited to serve compelling State goals.

For the reasons stated, the judgment of the circuit court of White County dismissing the information is affirmed.

*Judgment affirmed.*